NO. PD-1603-14 ORIGINAL

IN THE

TEXAS

COURT OF CRIMINAL APPEALS

---

ALONZO GRAYSON, JR.,

        Petitioner,

vs.

THE STATE OF TEXAS,

        Respondent.

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 13 2015

Abel Acosta, Clerk

---

From the Fifth District Court of Appeals
No: 05-13-00832-CR

---

**PETITIONER'S PETITION FOR DISCRETIONARY REVIEW**

---

FILED IN
COURT OF CRIMINAL APPEALS

FEB 13 2015

Abel Acosta, Clerk

Alonzo Grayson, Jr.
Clements Unit - 1867695
9601 Spur 591
Amarillo, TX 79107-9606
Pro-se

## TABLE OF CONTENTS

PAGE

Table of Contents...................................... i

Index of Authorities................................... ii

Statement Regarding Oral Argument...................... 1.

Statement of the Case.................................. 1.

Statement of Procedural History........................ 1.

Grounds For Review..................................... 2.

Argument............................................... 2-6.

Prayer For Relief...................................... 7.

Certificate of Service................................. 7.

Appendix

# INDEX OF AUTHORITIES

PAGE

Brown v. State, 955 S.W.2d 724 (Tex.App.-Tyler 1998)................... 2
Chavez v, Martinez, 538 U.S. 760 (2003).................................. 4
U.S. v. Collins, 40 F.3d 95 (5th Cir. 1994)............................... 5
Hayes v. Wash, 373 U.S. 503 (1963)...................................... 4
Henderson v. State, 962 S.W.2d 544 (Tex.Crim.App. 1997)............... 5
U.S. v. Hughes, 640 F.3d 428 (5th Cir. 2011).......................... 5
U.S. Michael C., 442 U.S. 707 (1979).................................... 5
Mincey v. Arizona, 437 U.S. 385 (1978)................................. 5
Miranda v. Arizona, 384 U.S. 436 (1966)................................ 5
U.S. v. Reynolds, 367 F.3d 294 (5th Cir. 2004)........................ 5
Shaw v. State, 243 S.W.3d 647 (Tex.Crim.App. 2007).................... 3
U.S. v. Solis, 299 F.3d 420 (5th Cir. 2002)........................... 5
U.S. v. Thongsophorn, 503 F.3d. 51 (2007)............................. 5
Tidmore v. State, 976 S.W. 2d 724 (tex.App.-Tyler 1998)............... 2
Walker v. Packer, 827 S.W.2d 833 (Tex. 1992).......................... 4, 6
Woodfox v. State, 742 S.W.2d 408 (Tex.Crim.App. 1987)................. 3


Texas Penal Code § 9.31(a)............................................ 2, 3
Texas Penal Code § 2.03(d)............................................ 3
Texas Code of Criminal Procedure § 38.21............................. 5

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner is a state prisoner and the issues presented herein are not complex requiring oral argument. Therefore, the need for oral argument is not needed and Petitioner waives oral argument.

## STATEMENT OF THE CASE

After nearly thirty years, the Collin County Sheriff's Office investigate Petitioner for a murder. Two Deputies take and question Petitioner, an MHMR patient with mental disabilities. The interview was intense and conducted in a hospital police interview room that resulted in Petitioner nearly having to have medical attention. Under extreme pressure Petitioner gave a confession to the Deputies and an arrest warrant immediately followed with subsequent conviction.

## STATEMENT OF PROCEDURAL HISTORY

In May of 2013 and after a plea of not guilty, a jury convicted Petitioner of murder and sentenced him to fifty (50) years imprisonment and a fine of $5,000.00. Petitioenr gave timely notice of appeal and on November 17, 2014, the Fifth District Court of Appeals affirmed the conviction in a non published opinion in case number 05-13-00832-CR from the 296th District Court of Collin County, Texas in cause number 296-81500-2012. Petitioner now seeks Discretionary Review.

Page 1.

## GROUNDS FOR REVIEW

GROUND ONE:

THE FIFTH COURT OF APPEALS ERRED IN CONCLUDING THAT AN INSTRUCTION TO THE JURY ON SELF-DEFENSE WAS NOT REQUIRED BASED UPON THE EVIDENCE OF THE CASE.

GROUND TWO:

THE FIFTH COURT OF APPEALS ERRED IN DETERMINING THAT THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE PETITIONER'S MOTION TO SUPRESS HIS CONFESSION.

## ARGUMENT

GROUND ONE RESTATED:

THE FIFTH COURT OF APPEALS ERRED IN CONCLUDING THAT AN INSTRUCTION TO THE JURY ON SELF-DEFENSE WAS NOT REQUIRED BASED UPON THE EVIDENCE OF THE CASE.

"The defendant has the initial burden of producing some evidence to justify submission of a self-defense instruction." Tidmore v. State, 976 S.W. 2d 724, 729 (Tex.App.-Tyler 1998). Evidence of Petitioner's belief that force was immediately necessary to protect himself against Bobby Ray Taylor was clearly evident in the case and justified the use of force as allowed under Texas law. Texas Penal Code §9.31(a).

If the evidence raises the issue of self-defense, the trial court must submit a jury instruction on the defensive theory, regardless of whether such evidence is strong, feeble, impeached, or contradicted, and even if in the trial court's opinion the testimony is not entitled to belief. Brown v. State, 955 S.W. 2d 276, 279 (Tex. Crim.App. 1997(. Such instruction must be submitted to the jury even if the trial court does not believe the evidence, because the jury, not the judge, must decide the

the credibility of the evidence. Woodfox v. State, 742 S.W. 2d 408, 410 (Tex. Crim.App. 1987).

If a defense is raised by the evidence, the trial court must charge the jury that a reasonable doubt on the issue requires the jury to aquit the defendant. Texas penal Code §2.03(d); Shaw v. State, 243 S.W. 3d 647, 657-58 (Tex.Crim.App. (2007). The evidence presented at trial was clearly presented to raise the self-defense theory as required by law. The victim, Bobby Ray Taylor had commited an attempted aggravated assault with a deadly weapon by trying to run over the Petitioner with a car. (RR v. 4 pp. 157-158). Further, the victim did in fact assault Petition with a weapon by hitting him with a pool cue or other unknown weapon. (RR v.4 pp. 159-160). The victim also told Petitioner in the presence of many witnesses that "mother fucker, I'm going to get a gun" in which minutes later a group of people returned with the victim and surrounded Petitioner and came at him. (State's Ex. 89C @ 31:25).

Petitioner, as anyone else, would have believed that force was necessary in the present sitution to avoid further attack, assault or death at the hands of the victim. This clearly establishes and raises the issue of self-defnse in accordance with Texas law. Texas Penal Code § 9.31. Petitioner requested the court to give jury instruction on self-defense but ws denied. (RR v.6 p. 14).

A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to annalyze or apply the law correcttly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. Walker v. Packer, 827 S.W. 2d 833, 840 (Tex. 1992). The law of jury instruction on self-defense is clear and the evidence presented in the case was legally sufficient to give the jury an instruction on self-defense but the trial court abused it's discretion and refused the request for the instruction!

GROUND TWO RESTATED:

> THE FIFTH COURT OF APPEALS ERRED IN DETERMINING THAT THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE PETITIONER'S MOTION TO SUPPRESS HIS CONFESSION.

Petitioner is a mentally disabled person and at the time of the intense interrogation by Collin County Sheriff's Deputies Petitioner was heavily medicated and confussed. The tactics used by the Deputies were of such an intense mesure upon the Petitioner that he was asked if he needed medical attention. (State's Ex. 89C @ 44:40).

Confessions and other coerced evidence from a defendant are not admissible at trial. Chavez v. Martinez, 538 U.S. 760, 770 (2003). To determine if a defendant's statements were involuntary, a court must ask whether, under the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. Hayes v. Wash, 373 U.S. 503, 513-14 (1963) This inquiry centers upon: (1) the conduct of law enforcement officials in creating pressure,

and (2) the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 399-401 (1978).

More specifically, to determine whether a defendant's statement is the product of coercion and therefore involuntary, courts commonly consider: (1) the location of the questioning(Miranda v. Arizona, 384 U.S. 436, 457-58 (1966)), (2) whether Miranda warnings were given (U.S. v. Solis, 299 F.3d 420, 439-40 (5th Cir. 2002)), (3)and whether the accused initiated contact with law enforcement officials ( U.S. v. Thongsophaprn, 503 F.3d 51, 56 (5th Cir. 2007)). An accused's personal characteristics, such as youth (U.S. v. Michael C., 442 U.S. 707, 725-26 (1979)), drug problems (U.S. v. Reynolds, 367 F.3d 294, 299 (5th Cir. 2004)), physicial condition (U.S. v. Hughes, 640 F.ed 428, 439 (5th Cir. 2011)), and experience with the criminal justice system (U.S. v. Collins, 40 F. 3d 95, 98 (5th Cir. 1994)) are also factors used to determine voluntariness of a confession.

Due to the strategy of the Sheriff's Deputies the confession by the Petitioner was involuntary as it was based on deceit and coercion in violation of the U.S. Constitution and Article 38.21 of the Texas Code of Criminal Procedure. Henderson v. State, 962 S.W. 2d 544, 564 (Tex.Crim.App. 1997). Petitioenr being an MHMR patient was under heavy medical treatment and under extreme emotional and physical pressure as his wife was in the hospital where the interrogtion was conducted. As clearly outlined in the appellate brief on pages 17-19, the Deputies

continuously pressured Petitioner by coercion in telling him they would have done the same thing and what the victim had done was unacceptable. Further, telling Petitioner that after all was said and done they would all go their separate ways which clearly made Petitioner believe that no further action would be taken against him after the interrogation. The totality of illegal tactics used by the Sherif's Deputies and the mental disability of Petitioner and that his being under psychiatric medication, the confession was untruthful and involuntary and should have been suppressed by the trial court.

Even the Deputies claimed that they were putting "words in [Petitioner's] mouth." (State's Ex. 89C @ 26:45) However, the illegal interrogation continued and clearly resulted in an involuntary confession that the trial court should have suppressed. it was an abuse of discretion for the trial court to allow the illegal confession to be heard and presented to the jury as it resulted in Petitioner being convicted of a murder he never committed! Id. <u>Walker</u> @ 840.

The fifth District Court of Appeals has committed a grave error in making a ruling that affirms the murder conviction in this case based on an involuntary confession and this Court should revers with instructions to suppress the confession and order a new trial.

## PRAYER FOR RELIEF

Wherefore, Petitioner prays that this Court will give review of this case and after said review:

(1) enter an Order reversing the Appeals Court's opinion;

(2) enter an Order that the trial court abused it's discretion and erred in not including a jury instruction on self-defense,

(3) enter an Order that the trial court abused it's discretion in not suppressing the involuntary confession, and

(4) enter an Order granting Petitioner any and all further relief to which he is justly entitled.

Respectfully submitted,

Alonzo Grayson, Jr.
Clements Unit-1867695
9601 Spur 591
Amarillo, TX 79107-9606
January 20, 2015

## CERTIFICATE OF SERVICE

This is to certify that I have on this___day of January, 2015, served a true and exact copy of this document on the Respondent by placing the same in the prison mail system, postage paid, addressed to:

Wes Wynn,
Assistant District Attorney
2100 Bloomdale Rd., Suite 20004
McKinney, TX 75071

Alonzo Grayson, Jr.

APPENDIX

The Texas Court of Criminal Appeals has granted a request to Suspend Rules negating the requirement to provide a copy of the Fifth Court of Appeals opinion in this brief.

**Affirmed; Opinion Filed November 17, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-13-00832-CR

---

## ALONZO GRAYSON, JR., Appellant
## V.
## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 296th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 296-81500-2012

---

# MEMORANDUM OPINION
Before Justices Bridges, Lang, and Evans
Opinion by Justice Lang

Following a plea of not guilty, appellant Alonzo Grayson, Jr. was found guilty by a jury of murder. Punishment was assessed by the jury at fifty years' imprisonment and a $5,000 fine.

In two issues on appeal, appellant contends the trial court erred by (1) not including his requested instruction on self-defense in the charge of the court and (2) denying his motion to suppress his confession. We decide appellant's two issues against him. The trial court's judgment is affirmed. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case alleged that on approximately January 3, 1984, appellant caused the death of Bobby Taylor by shooting him with a firearm. A four-day trial commenced May 20, 2013.

At the start of trial, appellant filed a motion to suppress a noncustodial statement made by him to police on May 16, 2012. Appellant asserted in his motion to suppress that his statement was invalid under article 38.21 of the Texas Code of Criminal Procedure because it was not voluntary. *See* TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). Specifically, appellant contended (1) he was "harassed and badgered into making the statement" and (2) there were "promises and inducements" made by law enforcement officers that "were such a character that would influence [appellant] to speak untruthfully."

The trial court held a hearing outside the presence of the jury on appellant's motion to suppress. Defense counsel asserted at the hearing (1) on the date the statement was made, two detectives who were investigating this case met with appellant at a hospital where appellant was visiting a patient; (2) appellant went with the detectives to an "interview room" within the hospital that was used by "hospital police"; (3) the statement appellant made to the detectives included oral and written portions; and (4) two recordings of appellant's statement were made.

Defense counsel argued in part at the hearing,

> We feel that the way that things were phrased and the way they kept on him, first of all, when he is saying I didn't do it, I didn't kill anyone, et cetera, et cetera, and they keep saying no, no, no, you did it, you did it, you did it, and then they were saying, basically, you are not going to get arrested for this, nothing is going to happen to you, you are going to be a free man; all they really wanted to do was give these people peace.
>
> . . . .
>
> So we feel that that was—that under the circumstances that the statement became involuntary under 38.21 Code of Criminal Procedure because, first of all, they were overbearing his will, which you can read the script or you can hear how they are doing it. Every time he is saying he didn't do it, how they are contradicting, no, you did it, man; you did it; we have people that said you did it, et cetera.
>
> . . . .

–2–

The three prongs for voluntariness, in the way of making promises or assurances are, first, there must be promises that were made; second, by someone in authority or someone who appears to be in authority that would make someone testify untruthfully, and now that's been kind of clarified as to what that means.

It does not mean that the statements that the—a confession or statement given was untruthful, but that it puts the person in a position where they feel overall, as long as they testify, they are going to be okay. It is better to say it whether it is true or not.

. . . .

. . . And we believe under the circumstances, this statement, although it started out voluntary, he certainly was willing to start to talk, became involuntary because of those facts and circumstances.

The State argued in part at the hearing,

[A]s far as the voluntariness, the police never said anything—you better talk or we are going to prosecute you, or anything along those lines. What they did lay out was once we are through here, you are free to go, you are going to walk out of here.

. . . .

. . . So that's what they are laying the foundation for. You are free to go, we are going to let you leave; basically, you are not in custody right now. The stuff that they did during the course of the interview was nothing more than just interviewing techniques that many detectives use, which was that they, at points in times, they said we know you did it, here's why we know you did it.

And there is nothing that said if he didn't confess that something bad was going to happen to him for not confessing. They never laid that impression out there.

Defense counsel described to the trial court the portions of the recordings of appellant's statement that appellant contended showed involuntariness. Then, the trial court called a recess during which it viewed and listened to "the relevant portions" of the recordings of appellant's statement. When the trial court reconvened, the motion to suppress was denied. Then, the jury returned to the courtroom.

Taylor's mother, Bertha May Botkin, testified that at the time of Taylor's murder, she lived in a trailer park in Frisco, Texas. She stated Taylor was living with her brother in a different trailer in the same park. Botkin testified that her sixteen-year-old daughter, Tina, was living in a house nearby with appellant, who was "[m]aybe 19, 20." According to Botkin,

appellant and Taylor were "enemies." Botkin testified that on the evening in question, she last saw Taylor near a pool hall that was next to the trailer park.

Sergeant Russell Driver testified he is an investigator with the Collin County Sheriff's Office. In November 2011, he was assigned to investigate Taylor's homicide. He reviewed the reports and evidence from the "original" case file, including a 1984 statement written by appellant shortly after Taylor's death. Driver testified that the contents of appellant's statement led him to believe appellant was present at the crime scene. Additionally, Driver interviewed several people who had been interviewed by police during the 1984 investigation, including Tina. Driver stated that after speaking with Tina, he contacted several people she had mentioned, one of whom was appellant.

Driver testified appellant agreed to speak with him on May 16, 2012, at a hospital in Dallas. Driver stated appellant was visiting his wife, who was a patient in the hospital at that time. Driver spoke with appellant in an interview room in the hospital for approximately an hour. Another detective, Sergeant Selman, was also present during the interview. According to Driver, appellant made oral and written statements during the interview. After the interview, appellant went back to his wife's hospital room. Driver stated appellant was not arrested on that date.

According to Driver, (1) he did not feel the statements appellant made were coerced in any way, (2) no threats were made to appellant during the interview and no "scare tactics" or "anything like that" were used, and (3) he felt appellant was "lucid" during the interview and appeared to be able to understand the questions he was asked and answer those questions. Driver stated that the interview was recorded using the hospital's audio visual recording equipment. Additionally, he stated he made an audio recording of the interview using a small tape recorder attached to his belt clip. Driver testified there are several "gaps" in the video recording of the

interview, but all of those "gaps" are "covered by the audio recording" such that the two recordings together provide "a full picture as to the entire interview."

State's Exhibits 81, 82, and 83 were admitted into evidence over appellant's objection as to lack of voluntariness. Driver testified (1) State's Exhibit 81 is "the voluntary statement that [appellant] wrote out during the interview"; (2) State's Exhibit 82 is an "apology letter" written by appellant during the interview to the family of Roy Elizondo, who was arrested for Taylor's murder in 1984 based on accusations by appellant, but was never indicted; and (3) State's Exhibit 83 is an "apology letter" written by appellant to Taylor's father during the interview. In State's Exhibit 81, appellant wrote in part that he and Taylor argued near the pool hall, Taylor threatened him, and "I shot him once and Tina him [sic] in leg."

Additionally, State's Exhibits 89C and 90C were admitted into evidence over appellant's objection on the ground of violation of articles 38.21 and 38.23 of the code of criminal procedure. State's Exhibit 89C is a copy of the video recording of the May 16, 2012 interview described above and State's Exhibit 90C is a copy of the audio recording of that interview made by Driver. Those exhibits were published for the jury.[1]

In the recordings, the detectives greeted appellant politely and sat down with him at a small table in an otherwise empty interview room. Both detectives were dressed in plain clothes rather than in uniform. At the start of the interview, Selman inquired about the health of appellant's wife and asked whether she is "gonna be all right." Appellant replied, "Yes, sir." Selman asked appellant what he remembered telling police in 1984 about Taylor's death. Appellant stated he did not recall what he told police in 1984. The detectives read appellant his

---

[1] Before the recordings were played for the jury, the parties agreed to redact the recordings to delete references to arrests and incarceration of appellant for offenses other than the one charged in this case. Thus, the recordings played for the jury differed in that respect from the recordings considered by the trial court during the hearing on appellant's motion to suppress. Additionally, the jury was given a "limiting instruction" that all references by the detectives in the recordings to "someone told them something" are hearsay and are not to be considered for the truth of the matter asserted.

–5–

written statement from 1984. In that statement, appellant wrote that he saw Elizondo kill Taylor by shooting Taylor five times.

Next, the detectives asked appellant to tell them about a fight between him and Taylor that occurred near the pool hall on the date Taylor was killed. Appellant stated Taylor called him "bad names" at the pool hall. Then, according to appellant, "[Taylor] ran back over there, he said '[expletive], I'm going to get a gun.' That's when he got his momma and them. . . . That's when they came at me." Additionally, appellant stated, (1) "We didn't fight, really, we argued. We didn't fight. He picked up a stick on me and ran through the fence. And that's when he got his momma and them" and (2) "Every time I walked down the railroad they would threaten me and [expletive], you know, tried to run over me." Appellant stated that sometime later on the evening in question, he was with Tina at the pool hall and again encountered Taylor.

The detectives' comments to appellant included the following: (1) an explanation as to "the why" of Taylor's murder could help "give some peace" to the families of those involved; (2) "Tell us why and we're going to walk out of here"; (3) "Things like this, they weigh on a man"; (4) "You've had a lot of bad things happen to you"; (5) "You've got a soul and a heart"; and (6) "Have you ever wondered why bad things happen to you?"

Appellant stated several times during the interview that he did not kill Taylor. Selman stated, in part, (1) "you did," (2) "you shot Bobby," (3) "it sounded like more of a self-defense thing at first," (4) "I think [Taylor] was threatening and challenging you," (5) Taylor "got himself killed" by "running his gums," (6) "I would have probably done the same thing back then," (7) Taylor "pushed the wrong buttons" by making racist comments to appellant that were "not acceptable" and (8) it was "understandable" that a person who shot another in self-defense and then "panicked and didn't know what to do" might try to hide the body and not tell anyone. Further, Selman stated during the interview (1) "I'm putting words in your mouth and I don't

want to do that," (2) "I don't want anything out of here that ain't true," and (3) "I don't want anything that didn't happen."

Midway through the interview, appellant stated that he shot Taylor. The detectives asked appellant whether the pistol he used was "a revolver" or "an automatic." Appellant's answer was inaudible. At that point, Selman touched the firearm that was in plain view in a holster on his belt and asked, "Was it one like this, where the slide goes back and forth, or did it have a wheel that you put the bullets in?"

After appellant confessed to shooting Taylor, Selman stated, "Like I told you, you're going to walk out of here and we're going to go our separate ways." Additionally, later in the interview, Selman asked appellant to put in writing what he had told them. Selman stated in part, "When we're done talking here, you will still not be under arrest. Okay? I want you to know that. Sergeant Driver and I are going to go get in our car and leave. You'll probably talk to us later. At some point we'll have to take it to the grand jury." Then, appellant wrote the statement described above that was admitted into evidence as State's Exhibit 81.

During the interview, appellant stated he was currently "on psych medication." Additionally, appellant coughed frequently during the interview. At one point, Driver left the room and returned with water for appellant. Further, toward the end of the interview, appellant began coughing loudly and the detectives asked appellant if he needed a doctor. Appellant declined medical care.

Sergeant Mitchell Selman testified he is an investigator with the Collin County Sheriff's Office. He stated he was present at the May 16, 2012 interview of appellant described above. On direct examination, Selman testified in part that he (1) brought up self-defense during the interview merely as "a technique to try to get [appellant] comfortable and try to give him an out in order to get him to speak" and (2) had not reviewed anything that caused him to believe

—7—

Taylor had acted in a way that would cause appellant to react in self-defense. On cross-examination, Selman stated in part that appellant described (1) an incident involving a stick, (2) a threat by Taylor to "go get a gun," and (3) another threat by Taylor "at the time of the last fight."[2] Additionally, on redirect examination, Selman testified appellant (1) described Taylor "chasing" him with "a stick of some sort" and (2) stated he was not hit with a pool stick.

Appellant testified on direct examination that when he stated during the interview that someone tried to run him over, he was referring to an incident about a week before Taylor was killed. According to appellant, he was walking on the side of the street and a truck driven by Taylor's parents came close to hitting him. Appellant stated he "jumped out of the way." Appellant testified Taylor was not in the truck with his parents.

---

[2] Specifically, Selman testified in part on cross-examination,

Q. Now, during the interview, Alonzo indicated at one point that Bobby Taylor had attempted to run him over. Do you remember that?

A. I remember him being chased with a stick. I don't recall the run-over part. But again—

Q. But if it is on the—

A. If it is on the tape, it's in there.

. . . .

Q. You also recall during the interview how Alonzo had indicated that at some point, Bobby Taylor had said he was going home and getting a gun. Do you remember hearing that?

A. Yes.

. . . .

Q. And he did say that Bobby Taylor had gone home and came back with his mama and some other people? It was not exactly specified, but there was other people as well?

A. It sounded to me that it was a precipitating event prior to the final fight.

. . . .

Q. So to piece this together, from what Alonzo said as to—as the reason why he shot Bobby Taylor once was we had, at least from what Alonzo was saying, a threat to kill him or cause him serious bodily injury by attempting to run him over in some way, a second threat to go get a gun, and now another threat made at the same time as the argument while he is being called a [expletive]; would that be fair?

A. To some degree, yes. I think the two precipitating arguments are unspecified in date in that time. Now, maybe during—based upon that statement, yes, he may have threatened him at the time of the last fight.

Q. Right. And the threat wasn't specified in what he wrote, other than he said threat?

A. Yes, he was threatened by some way.

Q. And you would agree, would you not, that raises a question as to whether or not this might have been self-defense? It raises that as an issue, doesn't it?

A. It might raise it as an issue, yes.

Further, appellant stated in part on direct examination that on the date Taylor was shot, Taylor told appellant he was "going to get a gun." Specifically, appellant testified,

Q. All right. So where was—where were you and Bobby when he said he was going to get a gun?

A. Over by the pool hall.

. . . .

Q. Well, you heard something that you said on the interview that you had with the police last year something about coming back with his mama and some people?

A. Yes, sir.

. . . .

Q. So it was Bobby, his mother, and three others?

A. Yes, sir.

. . . .

Q. . . . So they came back, and what happened when they came back?

A. They started talking noise [sic].

. . . .

Q. Were they talking to you?

A. Yeah.

Q. What were they saying to you?

A. Just cussing me out and stuff.

Q. How did you respond to that?

A. I just walked away.

. . . .

Q. Now, were they just calling you names, were they telling you to do something, were they telling you not to do something, were they threatening you? What were they saying?

A. They were just calling me names.

. . . .

Q. What was the reason you walked away?

A. I didn't want no trouble.

. . . .

Q. Were you concerned for your safety at all or no?

A. Yes, sir.

Q. You were? Why?

A. I was afraid they was going to do something to me.

Q. When you walked away towards the railroad tracks, did they stay where they were or did they follow you, or what happened?

A. They stayed where they were.

Q. So you were basically, more or less, allowed to walk away at that point?

A. Yes, sir.

Additionally, appellant testified on direct examination (1) he did not shoot Taylor; (2) his 2012 statement to police is incorrect; (3) he is currently taking several "psych" medications, including "Trazodone, Restidone, and Benadryl"; (4) he was taking those same medications at the time of the 2012 interview in question; (5) he feels those medications "affect" his memory; (6) he cannot currently remember what happened on the date Taylor was shot; (7) his memory was better at the time of the 2012 interview than it is now; and (8) Taylor threatened him. Appellant's testimony included the following:

Q. Okay. Well, we are trying to find out here about the self-defense issue. The officers brought it up and you said that was true, so we are trying to find out some facts here. You know, you mentioned in your written statement that Bobby threatened you. Do you remember that?

A. Right.

Q. And you remember that it was a threat against your life but you can't remember the words; is that right?

A. Right.

Q. So was there some type of self-defense that came up at that point in your mind?

A. Yes, sir.

Q. So what was the self-defense? What was Bobby doing since we know—since just simply saying something by itself isn't self-defense. What did he do that made you fear for your life?

A. He threatened me.

—10—

Q. Now, when he threatened you, was it just words or was he making gestures or was he moving his body, or what was he doing?

A. Just words.

Q. Words?

A. Yes, sir.

Q. And when he threatened you, you felt like you had to defend yourself?

A. Yes, sir.

Q. So what did you do to defend yourself?

A. I didn't do anything.

On cross-examination, appellant testified in part as follows:

Q. Your testimony today, that's what I want to talk about, what you recall today, that you did not shoot Bobby Taylor?

A. Yes, sir.

Q. So you didn't shoot him because he threatened you?

A. Yes, sir.

Q. You didn't shoot him because you felt like you were in some kind of danger; is that correct?

A. Correct.

Q. You didn't shoot him because you felt like Tina was in some kind of danger?

A. Correct.

At the charge conference, appellant requested a jury instruction on self-defense, which appellant contended was "raised by the evidence." Specifically, defense counsel argued in part (1) appellant "agreed that the deceased had first threatened he was going to get a gun" and "came back with a group of people against him," (2) "also there's something else that was in [the interview] which was attempts to run over—run him over," and (3) in the written portion of

–11–

appellant's 2012 statement, "immediately prior to saying that he shot the deceased, [Taylor], he said he was threatened." Appellant's request was denied by the trial court. The trial court stated in part there was no evidence deadly force "would be justified."

The charge of the court instructed the jury as to murder and the lesser-included offense of voluntary manslaughter and allowed for conviction respecting either offense. Specifically, as to voluntary manslaughter, the charge stated "[a] person commits the offense of voluntary manslaughter if he causes the death of an individual under circumstances that would constitute murder, except that he caused the death under the immediate influence of a sudden passion arising from an adequate cause." "Adequate cause" was defined in the charge as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection."

During closing argument, the State argued in part as follows respecting voluntary manslaughter:

> It can't be, Oh, yeah, this guy called me names all the time or he threatened me before, which I don't know that there's actually much evidence of that or credible evidence, I should say. But it has to—something has to happen at the time of the offense, and there's absolutely no evidence of that. No evidence.

Defense counsel asserted in part during closing argument, "A white man calling a black man a [expletive] repeatedly for months, doing it again in the middle of an argument and threatening him? What is sudden passion? What is adequate cause if it's not that?"

The jury found appellant guilty of murder and assessed punishment as described above. This appeal timely followed.

## II. DENIAL OF REQUESTED JURY INSTRUCTION ON SELF-DEFENSE

### A. Standard of Review

Appellate review of alleged jury charge error generally involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Abdnor v. State*, 871 S.W.2d 726,

-12-

731 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). First, we must determine whether error occurred. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Abdnor*, 871 S.W.2d at 732. If there is error in the charge, we must then analyze whether sufficient harm resulted from the error to require reversal. *Wooten*, 400 S.W.3d at 606. Under this second step, the degree of harm necessary for reversal generally depends on whether the appellant properly preserved the error by objection. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If error has been properly preserved, reversal is required if the error is "calculated to injure the rights of defendant," meaning there must be some harm. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Almanza*, 686 S.W.2d at 171. This standard requires the reviewing court to find that the defendant "suffered some actual, rather than merely theoretical, harm from the error." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In evaluating whether there was some harm from the error, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171). In analyzing harm from a jury charge error, neither the State nor the defense has a burden to show harm. *Reeves*, 420 S.W.3d at 816.

We review a trial court's decision not to include a requested instruction on a defensive issue in the jury charge for abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). In doing so, "we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 781 (Tex. Crim. App. 2006).

–13–

## B. Applicable Law

A trial court is required to submit a jury charge that sets out the law applicable to the case. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). A defendant who requests a self-defense instruction is entitled to that instruction "if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that th[e] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007).

Section 9.31(a) of the Texas Penal Code, titled "Self-Defense," provides in part that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). To use deadly force in self-defense, the actor must be authorized to use force under section 9.31 and must reasonably believe that deadly force is immediately necessary to (1) protect the actor against the other's use or attempted use of unlawful deadly force or (2) prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, or robbery. *Id.* §§ 9.32(a), 9.31(d). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42) (West Supp. 2014); *see also Valentine v. State*, 587 S.W.2d 399, 401 (Tex. Crim. App. 1979) (in accordance with penal code, "a reasonable apprehension of danger, whether it be actual or apparent, is all that is required before one is entitled to exercise the right of self-defense against his adversary"). The use of force

–14–

against another is not justified in response to verbal provocation alone. TEX. PENAL CODE ANN. § 9.31(b)(1).

### C. Application of Law to Facts

In his first issue, appellant contends the trial court erred by not including his requested jury instruction on self-defense in the charge of the court because there was "some evidence" at trial that appellant was entitled to that instruction. Specifically, appellant asserts,

> Evidence presented at trial was that Bobby Ray Taylor had attempted to run over Appellant with a car. There was some indication that on the night he was killed, Taylor may have hit Appellant with a pool cue, or some other type of stick. Also on the night he was killed, Taylor told Appellant, "[expletive], I'm going to get a gun" and Appellant stated that a group of people then returned with the victim and "came at him."

(citations to record omitted). According to appellant, "the jury, not the court should have made the determination as to which account of the incident to believe."

The State responds that the evidence did not support an instruction on self-defense. According to the State,

> There was no evidence indicating that the victim had used or attempted to use deadly force against Appellant in order to justify Appellant's conduct. Appellant relies on incidents that occurred before—not during—the offense and were no more than threats. These did not demonstrate either an immediate need for self-defense or a use or attempted use of deadly force and thus did not require a self-defense instruction.

Further, the State argues any error was harmless.

The record shows that in the 2012 interview described above, appellant stated "they" tried to "run over" him. During trial, appellant testified (1) he was referring to an incident approximately a week before Taylor was shot and (2) Taylor was not in the vehicle involved. In support of his assertion on appeal that "[e]vidence presented at trial was that [Taylor] had attempted to run over Appellant with a car," appellant cites Selman's testimony described above. However, the record does not show Selman testified as to who attempted to "run over" appellant.

Further, Selman testified the alleged attempt to "run over" appellant was "unspecified in date." Appellant's testimony that such incident took place on a date other than the date Taylor was killed is not contradicted by Selman's testimony or any other evidence in the record. We cannot agree with appellant that the evidence shows conflicting accounts of that incident.

Next, we address appellant's assertion that "[t]here was some indication that on the night he was killed, Taylor may have hit Appellant with a pool cue, or some other type of stick." Again, appellant cites Selman's testimony described above to support that assertion. However, that testimony does not include any statement by Selman that Taylor "may have hit Appellant" with a stick. Rather, Selman testified that during the 2012 interview, appellant (1) described Taylor "chasing" him with "a stick of some sort" and (2) stated he was not hit with a pool stick. Selman's testimony did not address the timing of the stick incident. The record shows appellant's only mention of a stick during the interview was the following statement: "We didn't fight. [Taylor] picked up a stick on me and ran through the fence. And that's when he got his momma and them." Appellant's statement as to the timing of that incident, i.e. that it preceded Taylor running away, is not contradicted by any evidence in the record.

Finally, appellant contends that on the night Taylor was killed, (1) Taylor told him, "'[expletive], I'm going to get a gun'" and (2) Taylor returned with a group of people and "they came at [appellant]." In support of that contention, appellant cites the video recording of the 2012 interview. However, appellant stated in the interview that subsequent to that incident, he encountered Taylor again later that evening at the pool hall. Further, appellant testified at trial (1) the people in the group "were just calling me names" and (2) he walked away and was not followed.

On this record, we cannot agree with appellant that there is some evidence to support a reasonable belief by him that the shooting in question was "immediately necessary" to protect

—16—

him from any of the three alleged dangers he describes. *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a); *Shaw*, 243 S.W.3d at 657–58; *see also Trammell v. State*, 287 S.W.3d 336, 341 (Tex. App.—Fort Worth 2009, no pet.) (threat made several hours earlier did not justify use of deadly force).

Further, any error in denying the requested self-defense instruction is reversible only if the record shows "some harm" to appellant. *See Sakil*, 287 S.W.3d at 25–26; *Barron*, 353 S.W.3d at 883. The evidence in this case included appellant's trial testimony that the "threat" upon which his claim of self-defense was based consisted of "just words." Additionally, (1) the charge of the court allowed for conviction on the lesser included offense of voluntary manslaughter, (2) the jury was instructed in part that "adequate cause" for purposes of voluntary manslaughter included "cause that would commonly produce a degree of . . . terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection," and (3) the closing arguments of both sides addressed alleged "threats" made against appellant. The jury rejected the option to convict appellant on the lesser included offense of voluntary manslaughter. On this record, we conclude any error by the trial court in denying appellant's requested self-defense instruction was harmless. *See Cornet v. State*, 417 S.W.3d 446, 453–54 (Tex. Crim. App. 2013) (omission of defendant's requested defensive jury instruction was harmless error where verdict was strong indication jury rejected defendant's defensive theory).

We decide appellant's first issue against him.

## III. DENIAL OF APPELLANT'S MOTION TO SUPPRESS

### *A. Standard of Review*

In reviewing a trial court's ruling on a motion to suppress, an appellate court must apply an abuse of discretion standard and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011)

–17–

(citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We give almost complete deference to the trial court's determination of historical facts and mixed questions of law and fact that rely upon an assessment of the credibility and demeanor of a witness, but apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.* at 923. If the trial court makes express findings of fact, we review the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports those factual findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We must uphold the trial court's ruling if it is reasonably supported by the record and correct under any applicable theory of law. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013); *Hereford v. State*, 339 S.W.3d 111, 117–18 (Tex. Crim. App. 2011).

Generally, we limit the scope of our review to the evidence adduced at the suppression hearing. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). However, when the parties subsequently re-litigate the suppression issues at the trial on the merits, we consider the evidence from both the suppression hearing and the trial in our review of the trial court's determination. *Gutierrez*, 221 S.W.3d at 687.

### B. Applicable Law

Article 38.21 of the Texas Code of Criminal Procedure provides "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21; *see Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). In assessing whether the voluntariness requirement of article 38.21 has been met, we consider the totality of the circumstances surrounding the acquisition of the statement, including such factors as intelligence, age, experience, education, and maturity. *Creager v.*

–18–

*State*, 952 S.W.2d 852 (Tex. Crim. App. 1997) (citing *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985)); *Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007). "The ultimate question is whether the suspect's will was overborne." *Creager*, 952 S.W.2d at 852.

Pursuant to article 38.22, section 6, of the code of criminal procedure, "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West. Supp. 2013). Additionally, "[i]f the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause." *Id.* Section 6 of article 38.22 applies to both an accused's custodial and non-custodial statements. *Oursbourn*, 259 S.W.3d at 171.

Inquiries as to voluntariness under article 38.22 do not turn solely on police overreaching. *See id.* at 172; *Leza v. State*, 351 S.W.3d 344, 352 (Tex. Crim. App. 2011). Circumstances unattributable to the police that nevertheless adversely impact an accused's ability to resist reasonable police entreaties, such as intoxication, are "factors" in the voluntariness inquiry, though they "are usually not enough, by themselves, to render a statement inadmissible under Article 38.22." *Leza*, 351 S.W.3d at 353.

Article 38.23(a) of the code of criminal procedure provides in part that no evidence obtained in violation of any provisions of the constitution or laws of Texas or the United States shall be admitted in evidence against the accused on the trial of any criminal case. TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005).

### C. Application of Law to Facts

In his second issue, appellant contends the trial court abused its discretion by denying his motion to suppress his confession because "the detectives engaged in coercive tactics and trickery and deception to induce Appellant to confess to shooting the victim, thereby rendering Appellant's confession involuntary." According to appellant, (1) he was "intimidated" by "the presence of not one, but two sheriff's deputies, one of whom shows his gun to Appellant at one point in the interview" and the fact that the room where the interview took place was "an actual police interrogation room" within the hospital where he was visiting his wife; (2) he informed the officers during the interview that he was currently taking "psych" medication; (3) he was "distracted" by the medication he was taking and his wife's "condition"; (4) he was experiencing "health problems that are so severe that at one point Driver asks him if he needs a doctor"; (5) the officers made a number of statements "clearly calculated to appeal to [his] sympathies"; (6) the officers misled him by "continually making statements that would lead him to believe that his actions were justified and there would be no consequences of a confession"; (7) the officers made "promises" that he was "going to be able to walk out of the interrogation room at the conclusion of the interview" and such "promises" were "phrased" in a way that led him "to further believe that there would be no future consequences to a confession because the officers failed to inform him that they would be charging him with murder"; and (8) the officers "fill[ed] in details for [him]" after he "insist[ed] that he does not remember the details of the incident." According to appellant, "each of these facts, standing alone, would not necessarily support a conclusion that his confession was coerced." However, he argues, "under the totality of the circumstances, . . . the combined factors listed above rendered the statement involuntary."

The State responds in part that the trial court properly admitted the evidence respecting the 2012 interview in question because appellant's statement was voluntary. According to the

State, the officers' conduct during the interview was not coercive, they did not make any threats or promises to induce appellant's confession, and there was no evidence of any physical or mental problems that would render appellant unable to give a voluntary statement.

The record shows that although the trial court held a voluntariness hearing outside the jury's presence as required by section 6 of article 38.22, no written conclusion and findings of fact as described in that section were filed in the trial court.[3] *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *see also Oursbourn*, 259 S.W.3d at 171 (section 6 of article 38.22 applies to both an accused's custodial and non-custodial statements). Therefore, we abated this appeal and requested the trial court to comply with the requirements of article 38.22, section 6. *See Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013). Subsequently, the trial court made written conclusions and findings of fact that have been filed in this Court in a supplemental clerk's record.

The trial court's findings of fact include the following: (1) appellant was middle-aged and had an extensive history with the criminal justice system; (2) the police officers were in plain clothes, polite, and nonconfrontational during the interview; (3) the officers' tone was conversational, not angry, and they did not threaten appellant; (4) the officers' sympathetic statements were not the type of statements that would overbear a person's will; (5) the officers' statements that suggested appellant's actions might have been justified as self-defense were not coercive; (6) such statements are a long-accepted interview technique that are not inherently coercive; (7) the officers did not promise appellant that he would not be charged or face further consequences for his actions; (8) Driver expressly told appellant that he would have to talk to the police and likely the grand jury at a later date, demonstrating he did not promise appellant he would not be charged; (9) appellant did not express any concern about his wife's medical

---

[3] Neither party made a request at any level of the proceedings for such conclusion and findings.

-21-

condition during the interview, nor does the record reflect whether her condition was serious or minor; (10) the mere fact of his wife's hospitalization does not render appellant's statements involuntary; (11) appellant mentioned during the interview that he was on "psych medications," but he did not identify the medications or suggest they affected his mental state; (12) simply being on medication does not make appellant's statements involuntary; (13) appellant suffered several coughing fits during the interview; (14) he was offered water by the officers and declined any medical attention; (15) appellant's coughing did not appear to affect his mental state in any way and did not render his statements involuntary; (16) the testimony of Driver and Selman regarding appellant's interview was consistent with the recorded interview; and (17) the testimony of Driver and Selman is credible.

Additionally, the trial court filed written conclusions of law that state as follows: (1) appellant knowingly, intelligently, and voluntarily waived his rights before being questioned by the police; (2) the police interview was not coercive; (3) the interview was recorded and met the requirements of Article 38.22 of the code of criminal procedure; and (4) the statements from appellant's 2012 interview were admissible.

First, we address appellant's complaint that he was "distracted" due to his medications. When the record reflects evidence of narcotics, medication, or other mind-altering agents, the question becomes whether those intoxicants prevented the accused from making an informed and independent decision to confess. *See Paolilla v. State*, 342 S.W.3d 783, 792 (Tex. App.— Houston [14th Dist.] 2011, pet. ref'd) (citing *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996)). The record shows appellant told the officers during the 2012 interview that he was on "psych" medication, but did not identify that medication at that time. During trial, appellant testified (1) he was on "Trazodone, Restidone, and Benadryl" at the time of the 2012 interview; (2) he feels those medications "affect" his memory; and (3) his memory was better at the time of

-22-

the 2012 interview than at the time of trial. However, appellant does not explain, and the record does not show, how such medications affected his decision to confess. *See id.* Further, the record in this case shows Driver testified he felt appellant was "lucid" at the time of the 2012 interview and the trial court found Driver's testimony credible.

Second, appellant does not explain, and the record does not show, how his "health problems" or those of his wife affected the voluntariness of his confession. Appellant told Selman at the start of the interview that his wife was going to "be all right." Appellant did not otherwise address her health during the interview. Further, appellant's only apparent "health problem" during the interview was a cough for which he was offered, and declined, medical attention.

Third, we address appellant's contention that he was "intimidated" by (1) being in "an actual police interrogation room" and (2) the presence of two officers, "one of whom shows his gun to Appellant." The record shows (1) the officers were in plain clothes and were seated across a small table from appellant in an otherwise empty interview room; (2) Driver rarely spoke during the interview; (3) when asking appellant about the type of gun he used, Selman touched, but did not remove, a gun that was in plain view in a holster on his belt; (4) Driver testified no "scare tactics" or "anything like that" were used during the interview; and (5) the trial court found Driver's testimony credible. Additionally, the record shows appellant had been arrested and incarcerated for other offenses and thus had experience with the criminal justice system. *See Green v. State*, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996) (stating that prior experience with criminal justice system weighs in favor of finding appellant's confession voluntary); *cf. Sample v. State*, No. 10–12–00038–CR, 2014 WL 1268827, at *6 (Tex. App.— Waco Mar. 27, 2014, no pet.) (rejecting appellant's complaint that he was intimidated by

–23–

presence of two officers at interview, where appellant had previous experience with police interrogation) (mem. op., not designated for publication).

Fourth, appellant complains the officers made statements "clearly calculated to appeal to [his] sympathies."[4] There is no per se rule against the use of psychological tactics in interrogations. *See Hernandez v. State*, 421 S.W.3d 712, (Tex. App.—Amarillo 2014, pet. ref'd); *Mason v. State*, 116 S.W.3d 248, 260 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). "For example, an interrogator may play on a suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency." *Mason*, 116 S.W.3d at 260. These ploys may play a part in the suspect's decision to confess, but so long as that decision "is a product of the suspect's own balancing of competing considerations," the confession is voluntary. *Id.*; *see also Gomes v. State*, 9 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("false friend" technique was merely an "attempt to facilitate communication by being friendly and supportive" and did not overcome voluntariness of confession). Appellant does not address, and the record does not show, how the statements described by him respecting his "sympathies" overbore his own balancing of competing considerations.

Fifth, appellant asserts the officers "continue[d] to fill in details for [him]" after he "insist[ed] that he does not remember the details of the incident." According to appellant, Selman stated, "I'm putting words in your mouth and I don't want to," then "continue[d] to do so." Appellant does not explain, and the record does not show, how Selman's continuing to "fill in details" overbore his will. Further, the record shows Selman also stated during the interview (1) "I don't want anything out of here that ain't true" and (2) "I don't want anything that didn't happen."

---

[4] In support of this complaint, appellant cites the following statements by Selman and Driver from the recordings: (1) "Things like this, they weigh on a man"; (2) "You've had a lot of bad things happen to you"; (3) "You've got a soul and a heart"; and (4) "Have you ever wondered why bad things happen to you?"

Finally, we address together appellant's contentions that the officers (1) misled him by "continually making statements that would lead him to believe that his actions were justified and there would be no consequences of a confession" and (2) made "promises" respecting appellant being able to "walk out of the interrogation room" that were phrased in a way that led appellant "to further believe that there would be no future consequences to a confession because the officers failed to inform him that they would be charging him with murder."[5] The record shows none of the statements cited by appellant that allegedly suggested his actions were "justified" addressed any "consequences of a confession." Further, for a promise to render a confession invalid under article 38.21, the promise must have been positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). While appellant cites several alleged "promises" by the officers that he would be allowed "to walk out of here," appellant does not cite or address Selman's statement, "You'll probably talk to us later. At some point we'll have to take it to the grand jury." That statement made clear that although appellant was not going to be arrested at the time of the interview, criminal charges were possible. We cannot agree with appellant that the record shows any "promise" of "no future consequences to a confession." *See id.*

On this record, considering the totality of the circumstances, we conclude the trial court did not err by concluding appellant's statement in question was voluntary. *See Creager*, 952 S.W.2d at 852.

---

[5] In support of these contentions, appellant cites the following statements of the officers from the recordings: (1) "If I was being beat up or assaulted, and I was defending myself and something happened, and I somehow managed to get a gun and shoot someone and panicked and didn't know what to do and didn't want to get in trouble, I might take the person out to the rock pit and try to hide him and not tell anybody—that's understandable"; (2) "I would have probably done the same thing back then"; (3) "It sounded like more of a self-defense thing"; (4) "Had Bobby not been running his gums, we probably wouldn't be here today"; (5) "Bobby got himself killed —I can see that"; (6) "[Bobby is] obviously a racist"; (7) "I think he was threatening and challenging you"; (8) "He called you a [expletive]. That's unacceptable"; (9) "He pushed the wrong buttons"; (10) "Tell us why and we're going to walk out of here"; and (11) "Like I told you, you're going to walk out of here and we're going to go our separate ways."

We decide against appellant on his second issue.

## IV. CONCLUSION

We decide appellant's two issues against him. The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
130832F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ALONZO GRAYSON, JR., Appellant

No. 05-13-00832-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-81500-2012.
Opinion delivered by Justice Lang, Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of November, 2014.